USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/31/2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

MICHAEL VAN HISE, ROBERT
CHRISTOPHER ASCH, and RICHARD
MELTZ,

Defendants.

**MEMORANDUM
OPINION & ORDER**

S4 12 Cr. 847 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Defendants Michael Van Hise, Christopher Asch, and Richard Meltz are charged

in Count One of Indictment S4 12 Cr. 847 (the "Indictment") with conspiracy to commit

kidnapping, in violation of 18 U.S.C. § 1201(c). (Dkt. No. 204) The conspiracy is alleged to

have taken place between the spring of 2011 and January 2013. The Government alleges that the

targets of this kidnapping conspiracy include Van Hise's wife, his step-daughter, his sister-in-

law, and her children. (Govt. Opp. Br. (Dkt. No. 226) at 4; United States v. Van Hise, 13 Mag.

0011 (Cmplt.) at 4; United States v. Asch and Meltz, 13 Mag. 00973 (Cmplt.) at 3-6)

Defendants Asch and Meltz are charged in Count Two of the Indictment with

participating in a second kidnapping conspiracy that took place between January 2013 and April

15, 2013. The Government alleges that the intended victim of this conspiracy was a woman who

– unbeknownst to the Defendants – is an undercover FBI agent. (Govt. Opp. Br. (Dkt. No. 226)

at 4; United States v. Asch and Meltz, 13 Mag. 00973 (Cmplt.) at 6-22)

Van Hise, Asch, and Meltz have moved to (1) dismiss Count One for failure to

properly allege venue and the interstate commerce element of the charged kidnapping offense;

and (2) for a severance. Van Hise has also moved to dismiss Count One on the grounds that this

charge violates his First Amendment rights. For the reasons stated below, Defendants' motions will be denied in their entirety.

## BACKGROUND

Van Hise came to the attention of federal authorities as a result of an investigation of Gilberto Valle. That investigation revealed Internet chats in which Valle and others discussed kidnapping, raping, and murdering certain women. In September 2012, the FBI learned that Van Hise was one of the individuals participating in such Internet chats with Valle. (United States v. Van Hise, 13 Mag. 0011 (Cmplt.) at ¶¶ 5, 7; United States v. Valle, 12 Mag. 2820 (Cmplt.) at ¶ 15)

Valle was arrested on October 24, 2012, and on November 15, 2012, he was charged with conspiracy to commit kidnapping, in violation of 18 U.S.C. § 1201(c), and with unauthorized use of a federal database, in violation of 18 U.S.C. § 1030(a)(2)(B). (United States v. Valle, 12 Cr. 847 (PGG), Indictment (Dkt. No. 9)) The Valle case proceeded to trial, and at trial the Government contended that Valle conspired with, inter alia, Van Hise to kidnap a young woman from Manhattan.[1] (United States v. Valle, 12 Cr. 847 (PGG) Trial Transcript at 1518-20)

Shortly before and after Valle's arrest, agents of the Federal Bureau of Investigation interviewed Van Hise. (US 004773-84) Van Hise told the FBI that he had been communicating with Defendants Asch and Meltz about kidnapping, raping, and murdering his wife, step-daughter, sister-in-law, and the sister-in-law's minor children. (United States v. Van Hise, 13 Mag. 0011 (Cmplt.) at ¶ 11; United States v. Asch and Meltz, 13 Mag. 00973 (Cmplt.) at ¶¶ 5-12) Van Hise also informed the FBI that he and Asch had met in New Jersey to discuss the kidnapping. (United States v. Asch and Meltz, 13 Mag. 00973 (Cmplt.) at ¶ 8) The FBI's

---

[1] On March 12, 2013, a jury convicted Valle on both counts. (Dkt. No. 126)

analysis of Van Hise's email communications with Asch and Meltz confirmed Van Hise's account. (Id. at ¶¶ 10-11) Van Hise agreed to "introduce" an FBI undercover agent to Asch over the Internet. (Dec. 11, 2013 Govt. Ltr. (Dkt. No. 230) at 1-2)

On January 4, 2013, Van Hise was arrested on a complaint and charged with conspiracy to commit kidnapping. (United States v. Van Hise, 13 Mag. 0011 (Cmplt.)) On January 31, 2013, a grand jury returned an indictment charging Van Hise with kidnapping conspiracy. (United States v. Van Hise, 12 Cr. 847 (PGG), Indictment (Dkt. No. 78))

The FBI's investigation of Asch and Meltz continued after Van Hise's arrest. On January 5, 2013, an undercover FBI agent ("UC-1"), posing as someone interested in kidnapping, raping, and murdering women, emailed Asch. (United States v. Asch and Meltz, 13 Mag. 00973 (Cmplt.) at ¶ 13) In their email exchanges, UC-1 and Asch discussed kidnapping, raping, and murdering women. (Id.) On January 7, 2013, Asch met with UC-1 in lower Manhattan to discuss a kidnapping plan. (Id. at ¶ 14)

Because UC-1 had "met" Asch through an Internet introduction by Van Hise, UC-1 and Asch frequently discussed Asch's relationship with Van Hise. (Dec. 11, 2013 Govt. Ltr. (Dkt. No. 230) at 1-2) The Government argues that these conversations are important to understanding how and why Asch developed a relationship of trust with UC-1. As Asch became more comfortable with the undercover agent, he began discussing aspects of the kidnapping-related activities he had engaged in with Van Hise, including the plans to kidnap Van Hise's wife and sister-in-law. (Id.) UC-1 was fully knowledgeable of these activities, and a jury could find that UC-1's knowledge of the plan to kidnap Van Hise's wife and sister-in-law made it more likely that Asch would trust UC-1 sufficiently to have conversations with UC-1 about other

abductions. That relationship of trust is also demonstrated by the fact that Asch discussed with

UC-1 whether Van Hise's arrest presented a risk to Asch. (Id.)

On January 18, 2013, Asch and UC-1 met at the South Street Seaport in

Manhattan. UC-1 and Asch discussed the fact that Van Hise's wife and sister-in-law had been

kidnapping targets. (Id.) The two also discussed a meeting Asch had had with Van Hise in New

Jersey. Asch stated:

> We talked about a number of things. I mean we drove around Trenton. He showed me
> this bar that he sometimes went to that he thought would be good so I, you know pick up
> a hooker. We drove down an alley that he thought would be a really good place to dump
> some(one). I mean it was too residential first of all, it was uhm, so we talked about a lot
> of things. He took me to a park where he thought would be a good dumping ground but
> you know I thought this is you know, no, you need to go to the mountains or something.

(Id. at 3)

Other meetings and numerous tape-recorded telephone conversations between

UC-1 and Asch took place in February and March 2013. At one meeting, UC-1 introduced Asch

to a second FBI undercover agent ("UC-2"). The two undercover agents ultimately proposed to

Asch that they target a third FBI undercover agent ("UC-3") – a female – for abduction, rape,

torture, and murder. (United States v. Asch and Meltz, 13 Mag. 00973 (Cmplt) at ¶ 15)

On March 13, 2013, UC-1, UC-2, and Asch met in Manhattan to further discuss

the kidnapping of UC-3. Asch brought a bag to the meeting that contained a number of items

that he believed were necessary for the planned kidnapping and torture. The bag contained, inter

alia, a black ski mask, hypodermic needles, handcuffs, a hammer, leather ties, forceps, and

doxepin hydrochloride, an anti-psychotic drug that is commonly used as a sleep agent. (Id. at ¶

16) Asch also brought literature regarding sexually-related torture devices, including a "leg-

spreader" and a "dental retractor." (Id.) During the March 13, 2013 meeting, Asch, UC-1, and

UC-2 also conducted surveillance of UC-3 as she left her workplace. (Id. at ¶ 17)

4

In early March 2013, Asch told UC-1 that his friend "Rick" – later identified as Defendant Meltz – was interested in participating in the kidnapping of UC-3. Asch gave UC-1 Meltz's cell phone number, and in a subsequent telephone call, Meltz discussed the kidnapping of UC-3 with UC-1. (Id. at ¶¶ 18-19) A wiretap was installed on Asch's home telephone in February 2013, and the FBI intercepted numerous telephone conversations between Asch and Meltz in which they discussed the kidnap and murder of women, including the planned kidnapping, rape, torture, and murder of UC-3. (Id. at ¶¶ 20-24)

On April 6, 2013, FBI agents followed Asch from Manhattan to a gun show in Allentown, Pennsylvania, at which he purchased a taser gun. (Id. at ¶ 25) During an intercepted March 3, 2013 telephone conversation, Asch and Meltz had discussed at length how useful a taser gun would be in effecting a kidnapping. (Id. at ¶ 22) In an April 7, 2013 telephone call, Asch told UC-1 that he had purchased a taser gun. (Id. at ¶ 26) More conversations between Meltz and UC-1 followed, in which the two discussed the kidnapping and murder of UC-3. (Id. at ¶ 28). On April 15, 2013, Asch met UC-1 in lower Manhattan to conduct surveillance of UC-3. Asch brought with him a number of items he believed would be useful in connection with the kidnapping, rape, torture, and murder of UC-3, including the taser gun, rope, a hammer, duct tape, zip ties, speculums, skewers, pliers, a dental retractor, and a leg-spreader. (Id. at ¶ 29)

On April 15, 2013, Asch and Meltz were arrested on a criminal complaint and charged with conspiracy to commit kidnapping. (United States v. Asch and Meltz, 13 Mag. 00973 (Cmplt.)) On September 18, 2013, the Government obtained a fourth superseding indictment. (United States v. Van Hise et al., S4 12 Cr. 847 (PGG) (Dkt. No. 204)) As discussed above, Count One of the fourth superseding indictment charges Van Hise, Asch, and Meltz with participating in a conspiracy between spring 2011 and January 2013 to kidnap Van

Hise's family members, and Count Two charges Asch and Meltz with conspiring between January 2013 and April 15, 2013 to kidnap UC-3. (Id.)

Trial is scheduled for January 27, 2014. (Dkt. No. 227)

## DISCUSSION

**I. VAN HISE'S MOTION TO DISMISS
COUNT ONE ON FIRST AMENDMENT GROUNDS**

Van Hise argues that the kidnapping charge against him is barred by the First Amendment. (Van Hise Br. (Dkt. No. 175) at 4) According to Van Hise, the kidnapping statute – 18 U.S.C. § 1201 – "is not unconstitutional on its face" but "is unconstitutional as applied to [him], because it prohibits his conduct[,] which consists of pure speech." (Id.) Van Hise goes on to argue that

> there is no evidence that [he] did anything other than talk about kidnapping. He did not have the ability, the intention, or even the actual desire to commit a kidnapping. He did not agree with anyone else to take these actions. Nor did he attempt to persuade or induce, his co-defendants or any other person to actually commit a kidnapping.

(Id. at 6)

While the Second Circuit has stated that "courts must be vigilant to insure that prosecutions are not improperly based on the mere expression of unpopular ideas," it has also made clear that where "the evidence shows that . . . speech[] crossed the line into criminal solicitation, procurement of criminal activity, or conspiracy to violate the laws, [a] prosecution is permissible." United States v. Rahman, 189 F.3d. 88, 117 (2d Cir. 1999). Moreover, it is clear that "[t]he First Amendment lends no protection to participation in a conspiracy, even if such participation is through speech." United States v. Sattar, 395 F. Supp. 2d 79, 101 (S.D.N.Y. 2005) aff'd sub nom. United States v. Stewart, 590 F.3d 93 (2d Cir. 2009); United States v. Stromber, 22 F.R.D. 513, 521 (S.D.N.Y. 1957) ("The First Amendment does not protect a conspiracy from punishment because speech is used to effect the crime.").

In order to obtain a conviction on the kidnapping conspiracy charged in Count One, the Government would have to demonstrate by proof beyond a reasonable doubt that (1) two or more people agreed to commit a kidnapping as described in Count One; (2) that Van Hise joined that conspiracy knowingly and willfully; and (3) that one member of the conspiracy took a concrete step in furtherance of the kidnapping conspiracy. See 18 U.S.C. 1201(c); United States v. Svoboda, 347 F.3d 471, 476 (2d Cir. 2003).

The Government has offered evidence that Van Hise – through email communications and a meeting with Asch – entered into an agreement with Asch and Meltz to kidnap and murder his wife, his step-daughter, his sister-in-law and her children. The evidence proffered by the Government demonstrates that Van Hise sent photos of his sister-in-law and the children to Asch and Meltz and that he provided them with the name of the street on which the sister-in-law and children live. (United States v. Asch and Meltz, 13 Mag. 00973 (Cmplt.) at ¶ 7) The emails proffered by the Government show that the defendants discussed and debated at length the means and methods by which they would carry out their plans. (Id. at ¶¶ 10-11) Van Hise also met in New Jersey with Asch to discuss a kidnapping plan and to surveil potential female kidnapping victims. (Id. at ¶ 8)

Although Van Hise states that he never had "the intention, or even the actual desire to commit a kidnapping" (see Van Hise Br. (Dkt. No. 175) at 6), such questions are for the jury. See, e.g., Morissette v. United States, 342 U.S. 246, 274 (1952) ("Where intent of the accused is an ingredient of the crime charged, its existence is a question of fact which must be submitted to the jury."); United States v. Speare, 297 F.2d 408, 410 (2d Cir. 1962) ("The question of whether criminal intent is inferable from the facts proved is a question for the jury.");

United States v. Sullivan, 98 F.2d 79, 80 (2d Cir. 1938) ("Plainly the issue of criminal intent was for the jury."); United States v. Baldeo, 1: (S1) 13 CR. 125, 2013 WL 5477373, at *5 (S.D.N.Y. Oct. 2, 2013) ("The question of whether [the Defendant] committed the alleged acts with the requisite mental state is for the jury to decide.").

There is evidence that Van Hise's "speech" crossed the line into a conspiracy to violate the law, and thus prosecution is permissible. Rahman, 189 F.3d at 117; see also New York v Ferber, 458 U.S. 747, 761-62 (1982) ("'It rarely has been suggested that the constitutional freedom for speech . . . extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute.'") (quoting Giboney Empire Storage & Ice Co., 336 U.S. 490, 498 (1949)). There is also evidence that Van Hise's conduct went beyond speech. He allegedly met with Asch – not in an Internet chat room – but in "real life" to discuss the kidnapping, rape and murder of women and children. Under these circumstances, it is a jury question whether the communications between Van Hise and his alleged co-conspirators rose to the level of a conspiratorial agreement. Accordingly, Van Hise's motion to dismiss Count One on First Amendment grounds is denied.

## II. DEFENDANTS' MOTION TO DISMISS COUNT ONE ON JURISDICTIONAL AND VENUE GROUNDS

All Defendants move to dismiss Count One on the grounds that it does not adequately allege (1) the interstate commerce element of the charged conspiracy; and (2) venue. (Van Hise Br. (Dkt. No. 214) at 2-7; Meltz Br. (Dkt. No. 217) at 3-4; Asch Br. (Dkt. No. 219) at 7)

### A. Interstate Commerce Element

Defendants argue that the indictment is defective in that it does not specify the type of "instrumentality of interstate commerce" that was to be used in the kidnapping

8

conspiracy or the manner in which the alleged instrumentality was to be used. (Van Hise Br. (Dkt. No. 214) at 4)

"[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117 (1974).

Where, as here, a defendant files a pre-trial motion to dismiss pursuant to Fed. R. Crim. P. 12(b), the Court accepts the allegations in the indictment as true, see United States v. Goldberg, 756 F.2d 949, 950 (2d Cir. 1985), and focuses on the legal sufficiency of the indictment, without considering the sufficiency of the evidence or contrary assertions of fact. See United States v. Alfonso,143 F.3d 772, 776-77 (2d Cir. 1998). "'An indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" Id. at 776 (quoting United States v. Stavroulakis, 952 F.2d 686, 693 (2d Cir. 1992); see also United States v. Ruing/Chambers, Dunhill Ins. Serv's., 798 F. Supp. 2d 517, 522 (S.D.N.Y. 2011).

In the context of Hobbs Act conspiracy, the Second Circuit has explicitly held that an indictment need not set forth how a robbery that the defendants conspired to commit would have "obstructed, delayed and affected commerce":

> The indictment does not specify what it was that defendants allegedly conspired to steal or precisely how the conspiracy would have affected interstate commerce. Rather, it alleges in conclusory terms that defendants conspired to commit robbery and thereby affected interstate commerce. We have never held that an indictment alleging a violation of the Hobbs Act must specify the precise nature of the effect upon interstate commerce that the government intends to prove at trial, and we decline to do so now. Accord United States v. Woodruff, 50 F.3d 673, 676 (9th Cir. 1995) ("Although the indictment contained no facts alleging how interstate commerce was interfered with, and did not state any theory of interstate impact, . . . the indictment was sufficient as written.") (Hobbs Act); United States v. Williams, 679 F.2d 504, 509 (5th Cir. 1982) ("An

9

indictment which alleges the interstate commerce element of a federal offense in conclusory terms, without setting forth evidentiary detail, is not insufficient.") (Hobbs Act); cf. United States v. McCarty, 862 F.2d 143, 145–46 (7th Cir. 1988) (holding that indictment under federal firearm statute need not specify precise effect on interstate commerce) (18 U.S.C. § 922(g)).  The indictment in this case is sufficiently specific to permit defendants to prepare their defense and to bar future prosecutions for the same offense.  It is therefore valid on its face.

Alfonso, 143 F.3d at 776.

Defendants have not explained why a different rule should apply here, as to the instrumentality of interstate commerce that was used and the manner in which it was used.[2]  The Indictment is sufficiently specific to permit Defendants to prepare their defense and to bar future prosecutions for the same offense.  No more is required.  Id.  To the extent that the motion to dismiss is based on the argument that the interstate commerce element is not adequately pleaded, the motion is denied.

### B. Venue

Defendants argue that Count One must also be dismissed because it does not set forth an act in furtherance of the conspiracy that took place within the Southern District of New York.  (Van Hise Br. (Dkt. No. 214) at 6-7)  Defendants cite no law in support of this argument, which has been repeatedly rejected.

It is black letter law that the "Government need only allege that criminal conduct occurred within the venue, 'even if phrased broadly and without a specific address or other information,' in order to satisfy its burden with regard to pleading venue."  United States v. Ohle, 678 F. Supp. 2d 215, 231 (S.D.N.Y. 2010) (quoting United States v. Bronson, No. 05 Cr. 714 (NGG), 2007 WL 2455138, at *4 (E.D.N.Y. Aug. 23, 2007)); see also Bronson, 2007 WL

---

[2]  In any event, it is obvious from the criminal complaints filed against the Defendants that the Government is alleging that the conspiratorial agreements were formed in large part through Internet-based "chats" and emails.

2455138, at *4 ("The Superseding Indictment alleges facts sufficient to support venue because it alleges that the criminal activity occurred 'within the Eastern District of New York and elsewhere.'"); United States v. Szur, S5 97 CR 108 (JGK), 1998 WL 132942, at *9 (S.D.N.Y. Mar. 20, 1998) ("[O]n its face, the Indictment alleges that the offense occurred 'in the Southern District of New York and elsewhere,' which is sufficient to resist a motion to dismiss."); United States v. Chalmers, 474 F.Supp.2d 555, 574-75 (S.D.N.Y. 2007) (rejecting defendant's argument that the "allegation that the charged conduct took place 'in the Southern District of New York and elsewhere' is insufficient to support venue because it fails to indicate which specific criminal acts were committed in this District").

Here, in Count One, the Government alleges that the offense occurred "in the Southern District of New York and elsewhere." See Indictment ¶ 1. This allegation is sufficient to survive a pre- trial motion to dismiss. See Bronson, 2007 WL 2455138, at *4; Chalmers, 474 F. Supp. 2d at 574-75; Szur, 1998 WL 132942, at *9. The question of whether there is sufficient evidence to support venue is appropriately left for trial. Defendants' motion to dismiss based on insufficient pleading of venue is denied.

## II.    **DEFENDANTS' MOTIONS FOR SEVERANCE**

Van Hise argues that he is entitled to a severance from Asch and Meltz because (1) all three defendants made statements to the FBI that present issues under Bruton v. United States, 391 U.S. 123 (1968) and Crawford v. Washington, 541 U.S. 36 (2004); (2) his defense is antagonistic to that of his co-defendants; and (3) the evidence against his co defendants is overwhelming in comparison to the evidence against Van Hise and will unfairly prejudice him at trial. (Van Hise Br. (Dkt. No. 175) at 14-15; Van Hise Br. (Dkt. No 214) at 7-9).

Asch and Meltz have moved for a severance from Van Hise arguing that (1) Van Hise's pre and post- arrest statements to law enforcement raise <u>Bruton</u> and <u>Crawford</u> issues; and (2) their defenses are antagonistic to that of Van Hise. (Meltz Br. (Dkt. No. 217) at 5-6; Asch Br. (Dkt. No. 219) at 4-6)

### A. <u>General Legal Standard For Severance</u>

Fed. R. Crim. P. 8(b) provides that two or more defendants may be joined in a single indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Joinder of defendants in multiple-count indictments is proper where the charged conduct is "'unified by some substantial identity of facts or participants' or 'arise[s] out of a common plan or scheme.'" <u>United States v. Attanasio</u>, 870 F.2d 809, 815 (2d Cir. 1989) (quoting <u>United States v. Porter</u>, 821 F.2d 968, 972 (4th Cir. 1987)); <u>accord United States v. Rittweger</u>, 524 F.3d 171, 178 (2d Cir. 2008). Joinder may be appropriate even where a defendant is not charged in a conspiracy count naming another defendant. <u>Id.</u> (citing <u>United States v. Feyrer</u>, 333 F.3d 110, 114 (2d Cir. 2003)).

The Second Circuit has stated that joinder is proper when "common factual elements" of different charges are readily apparent. <u>United States v. Turoff</u>, 853 F.2d 1037, 1044 (2d Cir. 1988). Thus, "counts might be 'connected' if one of the offenses 'depend[s] upon [ ] or necessarily l[leads] to the commission of the other,' or if proof of one act 'constitute[s][ ] or depend[s] upon proof of the other." <u>United States v. Shellef</u>, 507 F.3d 82, 98 (2d Cir. 2006) (quoting <u>United States v. Halper</u>, 590 F.2d 422, 429 (2d Cir. 1978)) (alterations in <u>Shellef</u>). Similarly, where one offense stems from the other, that link "provides a sound basis for joinder under Rule 8(b)." <u>Turoff</u>, 853 F.2d at 1044. Finally, where two charged conspiracies are

"intertwined" with each other, they are sufficiently related to justify joinder. Attanasio, 870 F.2d at 815.

Fed. R. Crim P. 14 provides that even where joinder is proper under Rule 8(b), a court may nonetheless grant a severance "if the joinder of offenses . . . in an indictment . . . appears to prejudice a defendant or the government . . . ." Fed. R. Crim. P. 14. In order to prevail on a severance motion under Rule 14, however, a "defendant must show not simply some prejudice but substantial prejudice." United States v. Sampson, 385 F.3d 183, 190 (2d Cir. 2004) (quoting United States v. Werner, 620 F.2d 920, 928 (2d Cir. 1980)) (emphasis in Sampson). The defendant has the "extremely difficult burden" of showing that he would be so prejudiced by joinder that he would be denied a fair trial. United States v. Casamento, 887 F.2d 1141, 1149 (2d Cir.1989) (internal quotation marks and citation omitted). It is not enough for a defendant to show that he "may have a better chance of acquittal in [a] separate trial[ ]." Zafiro v. United States, 506 U.S. 534, 540 (1993). Instead, "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of [a defendant], or prevent the jury from making a reliable judgment about guilt or innocence." Id. at 539. Even in those rare instances where a defendant establishes a "high" risk of prejudice, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." Id. (citing Richardson v. Marsh, 481 U.S. 200, 211 (1987)).

The Second Circuit has stated that "the principles that guide the district court's consideration of a motion for severance usually counsel denial." United States v. Rosa, 11 F.3d 315, 341 (2d Cir. 1993).

**B.** **Severance Based on _Bruton_ and _Crawford_**

**1.** **Confrontation Clause Requirements**

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "The crux of this right is that the government cannot introduce at trial statements containing accusations against the defendant unless the accuser takes the stand against the defendant and is available for cross examination." Ryan v. Miller, 303 F.3d 231, 247 (2d Cir. 2002).

To determine whether admission of an accusatory statement implicates the Confrontation Clause, a court must first determine whether the statement is "testimonial" in nature. United States v. Saget, 377 F.3d 223, 228 (2d Cir. 2004). "[P]rior testimony at a preliminary hearing, previous trial, or grand jury proceeding, as well as responses made during police interrogations," are "testimonial."[3] Id. at 228; see also Crawford, 541 U.S. at 51-53.

Admission of a witness's statement that implicates a defendant, and that is testimonial in nature, is permissible "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." Crawford, 541 U.S. at 59; see also id. at 68. Where, however, a declarant's statement is not testimonial, "the Confrontation Clause poses no bar to the statement's admission." United States v. Williams, 506 F.3d 151, 156 (2d Cir. 2007) ("'[A]fter Crawford and Davis [v. Washington, 547 U.S. 813 (2006)], indicia of reliability play no role in Confrontation Clause analysis. Rather, the inquiry under the Confrontation Clause is whether the statement at issue is testimonial. If so, the Confrontation Clause requirements of unavailability and prior cross-examination apply. If not, the

---

[3] "[T]he types of statements . . . [that are] testimonial share certain characteristics; all involve a declarant's knowing responses to structured questioning in an investigative environment or a courtroom setting where the declarant would reasonably expect that his or her responses might be used in future judicial proceedings." Saget, 377 F.3d at 228.

Confrontation Clause poses no bar to the statement's admission.'") (quoting United States v. Feliz, 467 F.3d 227, 232 (2d Cir. 2006)); Feliz, 467 F.3d at 231 ("[T]he right to confrontation only extends to testimonial statements, or, put differently, the Confrontation Clause simply has no application to nontestimonial statements.").

Where the Government seeks to offer a testimonial statement from a defendant who will not testify at trial, and that statement specifically inculpates a co-defendant, courts "cannot accept limiting instructions as an adequate substitute for [the co-defendant's] constitutional right to cross-examination." Bruton v. United States, 391 U.S. 123, 135-37 (1968). In such circumstances, courts generally have three options: (1) careful redaction of the out-of-court statement such that all references to the co-defendant are eliminated; (2) severance; or (3) exclusion of the statement at the joint trial. United States v. Jass, 569 F.3d 47, 56 n.5 (2d Cir. 2009)

The Second Circuit has approved two types of redaction to address Bruton concerns: (1) redaction that eliminates all reference to a co-defendant's existence; and (2) redaction that replaces a co-defendant's name with a neutral pronoun such that the statement, standing alone, cannot be understood to refer to the co-defendant. Jass, 569 F.3d at 56 & n.5 (quoting Marsh, 481 U.S. at 211 (noting that Bruton concerns may be addressed through use of a limiting instruction and redaction that "eliminate[s] not only the defendant's name, but any reference to his or her existence")); see also Jass, 569 F.3d at 56 (citing United States v. Tutino, 883 F.2d 1125, 1135 (2d Cir. 1989) (holding that "a redacted statement in which the names of co-defendants are replaced by neutral pronouns, with no indication to the jury that the original statement contained actual names, and where the statement standing alone does not otherwise

connect co-defendants to the crimes, may be admitted without violating a co-defendant's <u>Bruton</u> rights")).

The Second Circuit has made clear, however, that it strongly prefers the first method of redaction, which "eliminate[s] completely from a confession any mention of a non-declarant defendant's existence." <u>Id.</u> at 56 n.5. The second method of redaction, which employs neutral pronouns, should be employed "only" as a last resort, "when complete redaction would distort the confession . . . or chang[e] the tenor of the utterance as a whole." <u>Id.</u> (internal citation and quotation marks omitted). Moreover, the Supreme Court has cautioned that clumsy redactions that "simply replace a name with an obvious blank space or word such as 'deleted' or . . . other similarly obvious indications of alteration" do not suffice to eliminate <u>Bruton</u> concerns and in fact, "so closely resemble <u>Bruton's</u> unredacted statements that . . . the law [ ] require[s] the same result." <u>Gray v. Maryland,</u> 523 U.S. 185, 192 (1998).

Where a court has employed redactions involving the use of neutral pronouns, the Second Circuit has instructed that the propriety of the redactions should be considered in light of two inquiries: "(1) did the redacted statement give any 'indication to the jury that the original statement contained actual names,' and (2) did the 'statement standing alone . . . otherwise connect co-defendants to the crime.'" <u>Jass,</u> 569 F.3d at 58 (citing <u>Tutino,</u> 883 F.2d at 1135). A court considering the admissibility of a redacted statement that employs neutral pronouns must "view the confession in isolation from the other evidence" in order to insure that "the confession, when so viewed, does not incriminate the defendant." <u>United States v. Williams,</u> 936 F.2d 698, 700-01 (2d Cir. 1991). "The critical inquiry is always whether introduction of a confession at a joint trial presents an 'overwhelming probability' that the jury will not be able to follow an instruction limiting consideration of the confession to the declarant defendant." <u>Jass,</u> 569 F.3d at

56 n.5 (quoting Marsh, 481 U.S. at 208); see also id. at 60-61. If a redacted statement utilizing neutral pronouns passes this test, "it may be admitted with a proper limiting instruction even though other evidence in the case indicates that the neutral pronoun is in fact a reference to defendant." Williams, 936 F.2d at 700-01; see also Jass, 569 F.3d at 61 ("The critical inquiry is, thus, not whether a jury might infer from other facts (whether evidence admitted at trial or circumstances such as the number of defendants on trial) that a declarant's neutral allusion to a confederate might have referenced the defendant.").

### 2. Asch and Meltz's Request for a Severance from Van Hise[4]

As discussed above, Van Hise was interviewed by the FBI on multiple occasions, both pre- and post-arrest. He told agents that, while on a website called darkfetishnet.com, he had engaged in Internet "chats" with others who shared his interest in kidnapping, rape, and murder. (US 004774) Van Hise told the FBI that he sought out individuals who he believed were ready to act on their fantasies or had already done so. Two of the individuals Van Hise frequently chatted with were Asch and Meltz. Van Hise believed that both men were interested in raping and killing a "real" victim, in part because both had told him that they had committed abductions, rapes, and kidnappings in the past. (Id.; see also US 004777) Van Hise told the FBI that he had maintained contact with Asch, Meltz, and others with similar interests in order to help their victims and because he was bored. Van Hise further stated that he had repeatedly made reports to the Hamilton (N.J.) Police Department about what he saw online, but "they refused to act on it." (US 00477)

Because Van Hise's pre- and post-arrest statements were made in response to police questioning, they are "testimonial" within the meaning of Crawford. Having reviewed

---

[4] Asch and Meltz have not moved for a severance from each other.

those statements, however, this Court concludes that they can be redacted to avoid any <u>Bruton</u> or <u>Crawford</u> issue. Accordingly, Van Hise's statements to the FBI about Asch and Meltz do not justify a severance.

**3.    Van Hise's Request for a Severance from Asch and Meltz**

**a.    Post-Arrest Statements By Meltz**

Meltz does not mention Van Hise in his post-arrest statements, either explicitly or by implication. Accordingly, Meltz's post-arrest statements provide no basis for Van Hise's severance request.[5]

**b.    Asch's Statements to UC-1 After Van Hise's Arrest**

Asch's statements to UC-1 about his meeting with Van Hise in New Jersey – made after Van Hise's arrest – present no Confrontation Clause issue, because they are not testimonial. When Asch made these statements to UC-1 on January 18, 2013, Asch had no idea that he was speaking with a law enforcement officer, and he had no "awareness or expectation that his . . . statements [might] later be used at a trial." <u>Saget</u>, 377 F.3d at 228. Under these circumstances, there is no Confrontation Clause issue, because Asch's statements are not testimonial. <u>See, e.g.</u>, <u>United States v. Farhane</u>, 634 F.3d 127, 163 (2d Cir. 2011) (no Confrontation Clause issue where defendant "was unaware that he was speaking to agents for the government or that his statements might later be used at a trial"); <u>Williams</u>, 506 F.3d at 155-57 (co-defendant's statements to non-law enforcement witnesses implicating himself and the defendant in shootings were non-testimonial and therefore presented no issue under the Confrontation Clause); <u>Saget</u>, 377 F.3d at 229 ("a declarant's statements to a confidential

---

[5]  Asch made no post-arrest statement.   (Govt. Br. (Dkt. No. 189) at 9)

informant, whose true status is unknown to the declarant, do not constitute testimony with the meaning of Crawford").

It also appears that Asch's statements to UC-1 would be admissible against both Asch and Van Hise as a statement against penal interest under Fed. R. Evid. 804(b)(3). Rule 804(b)(3) provides that – where the declarant is unavailable – a statement is "not excluded by the rule against hearsay" where the statement is one that

> (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it . . . had so great a tendency to . . . expose the declarant to . . . criminal liability; and

> (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Fed. R. Evid. 804(b)(3); see United States v. Wexler, 522 F.3d 194, 202 (2d Cir. 2008) ("'[t]o satisfy [the penal interest] exception [to the hearsay rule], the proponent must show (1) that the declarant is unavailable as a witness, (2) that the statement is sufficiently reliable to warrant an inference that a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement'") (quoting United States v. Katsougrakis, 715 F.2d 769, 775 (2d Cir. 1983)) (alterations in Wexler).

In Saget, Saget argued that the trial judge had erred in admitting statements made by his alleged co-conspirator Beckham. Beckham had told a government informant about a gun-running scheme, "relaying his and Saget's gun-running practices, profits, and past exploits in a manner that implicated both himself and Saget." Saget, 377 F.2d at 225. The Second Circuit concluded that admission of these statements presented no Confrontation Clause issue, because "a declarant's statements to a confidential informant, whose true status is unknown to the

declarant, do not constitute testimony within the meaning of Crawford." Id. at 229. The court

also ruled that these statements were properly admitted under Fed. R. Evid. 804(b)(3), because

"the bulk of Beckham's statements were self-inculpatory [in that] they described acts that Saget

and Beckham [had] committed jointly." Id. at 231.

The same could be said about the statements Asch made to UC-1 about Van Hise.

With respect to Asch's meeting with Van Hise in New Jersey, Asch told UC-1 about how he and

Van Hise "drove around Trenton," how they looked at a bar that might be a possible source for

kidnap victims, how they drove down an alley that might be "a really good place to dump

someone," and how they looked at a park that also might "be a good dumping ground." (Dec.

11, 2013 Govt. Ltr. (Dkt. No. 230) at 2-3) Asch's "statements were self-inculpatory because

they described acts that [Asch and Van Hise] committed jointly." Saget, 377 F.3d at 231.

Similarly, in telling UC-1 that Asch and Van Hise had been "talking about . . .

choking [Van Hise's wife] . . . before hanging her . . . making it look like a suicide" (Dec. 11,

2013 Govt. Ltr. (Dkt. No. 230) at 2), Asch was describing acts that he and Van Hise had

discussed committing together.

The Government has also submitted corroborating evidence "that clearly

indicate[s] [the] trustworthiness [of Asch's statements]" to UC-1. Fed. R. Evid. 804(b)(3).

Asch's statements about the plan to kill Van Hise's wife are corroborated by Van Hise's own

emails to Asch and Meltz, in which Van Hise discusses in detail his desire to choke, rape, hang,

and murder his wife. See United States v. Asch and Meltz, 13 Mag. 00973 (Cmplt.) at ¶¶ 9-12)

Moreover, in his pre- and post-arrest statements to the FBI, Van Hise describes traveling to

Trenton to meet with Asch to discuss their kidnapping plans. (US 004774; US 004783) Van

Hise told the FBI that, as the two drove around the Trenton area, Asch "talked about different ways he would rape and kill different women that they passed on the road." (US 004783)

In sum, Asch's statements to UC-1 about Van Hise present no Confrontation Clause issue, because they are not testimonial under Crawford. Moreover, based on the record presently before this Court, it appears that these statements would be admissible under Fed. R. Evid. 804(b)(3) at a joint trial of Van Hise and Asch – or at a separate trial of Van Hise – because they constitute statements against Asch's penal interest and because there is compelling evidence of the trustworthiness of the statements. Accordingly, Asch's statements about Van Hise provide no basis for this Court to grant a severance.

### C. Severance Based on Irreconcilable Defenses

Van Hise also argues that he is entitled to a severance because his defense is antagonistic to that of his co-defendants. (Van Hise Br. (Dkt. No. 175) at 18) Van Hise states that he "will argue that he believed that Mr. Asch and Mr. Meltz intended to commit actual crimes, and that he was gathering information about them to assist the authorities." (Id. at 19)

Asch and Meltz similarly contend that their defense is antagonistic to that of Van Hise. (Meltz Br. (Dkt. No. 217) at 6; Asch Br. (Dkt. No. 219) at 6) Asch and Meltz intend to argue that their "communications with others regarding kidnapping, rape, and torture of women were fantasy and role playing and that [t]he[y] never intended to harm anyone or carry out any of the plans [t]he[y] discussed." (Id.)

The Second Circuit has recognized that there are circumstances in which

> antagonistic defenses may conflict to such a degree that codefendants are denied a fair trial. See, e.g., United States v. Serpoosh, 919 F.2d 835 (2d Cir. 1990). It is not the mere existence of antagonistic defenses that prompts a required severance[, however]. Instead, the defenses must conflict to the point of being so irreconcilable as to be mutually exclusive before we will find such prejudice as denies defendants a fair trial. See United States v. Villegas, 899 F.2d 1324, 1346

(2d Cir. 1990); [United States v.] Carpentier, 689 F.2d [21,] 28 [(2d Cir. 1982)]; United States v. Berkowitz, 662 F.2d 1127, 1133 (5th Cir. 1981). Defenses are mutually exclusive or irreconcilable if, in order to accept the defense of one defendant, the jury must of necessity convict a second defendant. The trial judge should order a trial severance when "'the jury, in order to believe the core of the testimony offered on behalf of [one] defendant, must necessarily disbelieve the testimony offered on behalf of his codefendant.'" Carpentier, 689 F.2d at 28 (quoting Berkowitz, 662 F.2d at 1134) (emphasis added); see also Serpoosh, 919 F.2d at 838; [United States v.] Potamitis, 739 F.2d [784,] 790 [(2d Cir. 1984)]. Similarly, severance should be granted when antagonism at the essence of the defenses prevails to such a degree – even without being mutually exclusive – that the jury unjustifiably infers that the conflict alone indicated that both defendants were guilty. See Serpoosh, 919 F.2d at 838; Berkowitz, 662 F.2d at 1134. Thus, an adversarial stance by a codefendant clearly does not, alone, require trials to be severed. Were this true, a virtual ban on multidefendant conspiracy trials would ensue since co-conspirators raise many different and conflicting defenses.

United States v Cardascia, 951 F.2d 474, 484-85 (2d Cir. 1991) (emphasis in original).

Here, a reasonable jury could accept Van Hise's defense that he never intended to commit a kidnapping – and was only communicating with Asch and Meltz for purposes of assisting law enforcement – and still accept Asch and Meltz's arguments that they were merely engaged in fantasy role-play. In other words, were the jury to accept Van Hise's defense, the jury would not be required as a logical matter to convict Asch and Meltz. Similarly, in order to accept Asch and Meltz's fantasy role-play defense, the jury would not be required to convict Van Hise. Defendants' defenses are not incompatible, much less "mutually exclusive or irreconcilable." Id. at 484. Indeed, all three defendants raise essentially the same defense: lack of criminal intent.

While Van Hise's belief that Asch and Meltz intended to commit a crime is antagonistic to Asch and Meltz's fantasy role-play defense, that asserted belief is not the "essence" of Van Hise's defense. The "essence" of Van Hise's defense is that he never intended to commit a crime, but was merely working to assist law enforcement. Similarly, the "essence" of Asch and Meltz's defense is that they were engaged in fantasy role-play and never intended to

commit a crime. A reasonable jury could accept that defense – despite Van Hise's views – simply by concluding that Van Hise was mistaken about Asch and Meltz's intentions. Stated another way, Van Hise's beliefs about the intentions of Asch and Meltz are not dispositive as to their intent, and a reasonable jury could acquit all three defendants based on the defenses they have asserted. See Cardascia, 951 F.2d at 485 (finding that no severance was warranted where two defendants had offered defenses that, "[al]though antagonistic and at points inconsistent, were not mutually exclusive at their core or essence"; one defendant had "claim[ed] [that] he was duped by the codefendants, who defrauded both Flushing Federal and himself, as president of the bank," while the other defendant "claim[ed] that he was not a part of the conspiracy, but rather an innocent and unknowing bystander implicated only by the uncorroborated assertions of his codefendants").

The Defendants' motions for severance based on irreconcilable defenses is denied.

### D.  Severance Based on Prejudicial Spillover

Van Hise argues that a joint trial will subject him "to a magnitude of 'prejudical spillover' that neither he nor the jury will be able to overcome with respect to the requisite particularized determination whether Mr. Van Hise was or was not a member of the charged conspiracy and ultimately, whether he is or is not guilty of the charge against him." (Van Hise Br. (Dkt. No. 175) at 19)

"It is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." Zafiro, 506 U.S. at 540. Indeed, "[Fed. R. Crim P.] 8(b) and 14 are designed to promote efficiency and to avoid a multiplicity of trials [so long as] these objectives can be achieved without substantial prejudice to the right of

the defendant to a fair trial." Id. (internal citation and quotation omitted).  Thus, in order to

prevail on a motion for a severance, the defendant carries the "heavy burden" of showing "not

simply some prejudice but substantial prejudice."  Sampson, 385 F.3d at 190 (emphasis in

original).  Substantial prejudice may be found where evidence admissible against jointly-tried

co-defendants "in some way affected the jury's ability fairly and rationally to evaluate the

evidence of . . . guilt." United States v. Hernandez, 85 F.3d 1023, 1029 (2d Cir. 1996).

 However, "to the extent that there exists some greater quantum of proof

implicating one defendant compared to another, this fact alone does not justify severance, for

'differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing

alone, are insufficient grounds for separate trials.'" United States v. Kahale, 789 F. Supp. 2d

359, 393 (E.D.N.Y. 2009) (quoting United States v. Scarpa, 913 F.2d 993, 1015 (2d Cir. 1990));

see also United States v. Locascio, 6 F.3d 924, 947 (2d Cir. 1993) ("[J]oint trials involving

defendants who are only marginally involved alongside those heavily involved are

constitutionally permissible.").

 The Second Circuit has long recognized that "the fact that evidence may be

admissible against one defendant but not another does not require a severance." United States v.

Carson, 702 F.2d 351, 367 (2d Cir. 1983).  A limiting instruction is sufficient to cure any

potential for spillover prejudice.  See United State v. DeVillio, 983 F.2d 1185, 1192-93 (2d Cir.

1993) (court's "explicit limiting instruction to the jurors that testimony [concerning an attempted

murder by co-defendants] could not be used as evidence against either [defendant]" was

sufficient to protect against potential prejudice of trying defendants together); United States v.

Chang An-Lo, 851 F.2d 547, 556 (2d Cir. 1988) (holding that despite defendants' claim that the

"overwhelming majority of evidence introduced at trial was not admissible against them," an instruction to the jury was sufficient to avoid the prejudice necessary for severance).

Accordingly, Van Hise's motion for a severance based on prejudicial spillover is denied.

## CONCLUSION

Defendants' pre-trial motions are denied in their entirety. The Clerk of Court is directed to terminate the motions. (Dkt. Nos. 173, 214, 216, 218)

Dated: New York, New York
       December 31, 2013

                              SO ORDERED.

                              _____
                              Paul G. Gardephe
                              United States District Judge