UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                      :

UNITED STATES OF AMERICA

                                      :                       12 Cr. 847 (PGG)

            - v. -

                                      :

GILBERTO VALLE,

                                      :

                Defendant.

                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## RESPONSE OF THE UNITED STATES OF AMERICA IN OPPOSITION TO THE DEFENDANT'S MOTION FOR A CERTIFICATE OF INNOCENCE

 

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Hadassa Waxman
Assistant United States Attorney
      -Of Counsel-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                  :
UNITED STATES OF AMERICA
                                                  :              12 Cr. 847 (PGG)
            - v. -
                                                  :
GILBERTO VALLE,
                                                  :
                  Defendant.
                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## RESPONSE OF THE UNITED STATES OF AMERICA IN OPPOSITION TO THE DEFENDANT'S MOTION FOR A CERTIFICATE OF INNOCENCE

The Government respectfully submits this response in opposition to defendant Gilberto Valle's May 27, 2016 motion for a Certificate of Innocence pursuant to Title 18, United States Code, Section 2513.   For reasons explained in more detail below, the Court should deny the defendant's application.

Section 2513 contemplates compensation for the truly innocent who have been prosecuted through no fault of their own. Here, there has been no finding – judicial or otherwise – that Valle is, in fact, innocent of the crime charged. Indeed, this Court overturned the jury's guilty verdict on the kidnapping conspiracy because of what the Court perceived to be a failure in the Government's proof.   And the Second Circuit Court of Appeals affirmed this Court's decision citing to the "insufficiency" of the Government's evidence at trial.

Moreover, through his own misconduct , which included searching protected law enforcement databases in violation of New York City Police Department policy, to obtain information about real women who were the subject of Valle's conversations involving gruesome acts of torture, Valle brought about his own prosecution. As such, this Court should deny Valle's motion for a certificate of innocence.

1

**STATEMENT OF FACTS**

I. **Offense Conduct**

From 2006 to 2012, Gilberto Valle was an officer with the New York Police Department. (Tr. 205-06). [1]    In 2010, he began visiting the Dark Fetish Network, a social media website for people who have an interest in cannibalism, asphyxiation, or other fetishes.    By early 2012, Valle began communicating with Dark Fetish Network members through email and Yahoo! Messenger.    Three of the people with whom Valle corresponded were Michael Van Hise of New Jersey; "Aly Khan," the screen name of a person whose IP address was traced to Pakistan; and "Moody Blues," a screen name for Dale Bolinger, a resident of the United Kingdom.    (Tr. 1031).    With these men, Valle discussed plans to kidnap, torture, kill and cannibalize a number of women, including his wife, Kathleen Mangan, Alisa Friscia, Kimberly Sauer, Andria Nobel and Kristen Ponticelli.    Valle had a personal connection to each of these women.    (Tr. 150-51, 418-652, 1030-34; GX 401-43).    In these electronic communications, Valle and his associates discussed, in detail, the logistics of kidnapping women and using violence against them.    (Tr. 418-652, 1030-34, 1364; GX 401-43).[2]    While participating in these electronic communications, Valle was researching how to make chloroform at home, attempting to gather location information about the target women, and conducting other research that the Government argued was in preparation for a kidnapping.

In July 2011, Valle looked up Sauer and Noble in police databases from his patrol car, despite knowing that NYPD policy only allowed such database searches for legitimate law

---

[1]  "Tr." refers to the trial transcript in the above-captioned case; "GX" refers to Government Exhibits introduced at trial.

[2]  Because the Court is very familiar with the conversations between Valle and his associates, the Government will not recite the conversation here.

2

enforcement purposes. (Tr. 571-84; GX 615, 616B, 616C, 616E, 617). The databases included personal information, including criminal history.

In August 2012, Valle's wife of two months, Kathleen Mangan, became concerned about his nighttime internet use.    On September 9, she installed spyware on the couple's shared MacBook computer. The next morning, she discovered several pictures captured by the software, including pictures of detached feet.    She also discovered that Valle had been using screen names such as "girldealer" and "girlmeathunter."    (Tr. 174-76, 180-83).    Mangan left the couple's apartment with their infant daughter, taking the MacBook with her.    After she discovered additional chat logs that discussed butchering her and other women, she contacted the FBI, providing them with the copies from the MacBook's hard drive, as well as keys to the couple's New York apartment. (Tr. 186-87).

Authorities arrested Valle on October 24, 2012.    When agents asked him if he had been on Alisa Friscia's block on March 1, 2012, Valle claimed that he had been there on that day to drop off his wife, who was having lunch with Friscia. (GX 432).    But both Mangan and Friscia testified that they did not meet for lunch that day. (Tr. 185-86).    Mangan had been on Manhattan's Upper East Side that day to visit a friend who had just had a baby, and Valle had dropped by while she was at the hospital. (Tr. 185-86).    Friscia lived on the Upper East Side, but Valle's answer to the agent's question was the only evidence that he was on Friscia's block on March 1, 2012.

A federal grand jury indicted Valle on one count of conspiracy to commit kidnapping, in violation of 18 U.S.C. § 1201 (Count One), and one count of accessing a computer without authorization, in violation of 18 U.S.C. § 1030(a)(2)(B) (Count Two).    Valle went to trial before

a jury.    His theory at trial was that his Internet chats were all fantasy and did not reflect actual criminal intent. (Tr. 1357-60, 1366-1421).    He moved for a judgment of acquittal at the close of the Government's case and at the close of the evidence, but the court reserved judgment each time.    (Tr. 1308, 1322, 1438).

After two days of deliberation, the jury convicted Valle on both counts. (Tr. 1685-86).

## II.  The Post-Trial Motion

Valle subsequently filed motions, pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure, seeking a judgment of acquittal and, alternatively, a new trial. Valle argued that the evidence was insufficient to establish his guilt of Count One, the kidnapping conspiracy, because the Government failed to demonstrate that his communications and actions were in furtherance of a bona fide kidnapping conspiracy rather than part of fantasy role-play. With respect to Count Two, unlawful access to a restricted database, Valle maintained that the offense reached only those who "hack" or break into such databases and not those, like Valle, who merely violated the terms of their access to a database. In the alternative, Valle asked for a new trial on the grounds that the jury's verdict was contrary to the weight of the evidence and the prosecution's summation was improper.

The Government opposed the motions, arguing that Valle's actions were not limited to fantasy communications in cyberspace.    The Government pointed out that the conspiracy targeted real women whom Valle knew, and Valle took steps in the real world--including physical surveillance of his targets--to prepare for the kidnappings. On Count Two, the Government submitted that the statute reached the unauthorized use of a restricted database and not just the use of such a database by an unauthorized person. Opposing the new trial motion, the

4

Government pointed to Valle's actions outside of cyberspace and other real world aspects of his plans showing that the jury's verdict was consistent with the weight of the evidence. It also defended the summation as having been fairly drawn from admitted evidence.

By Order and Opinion dated June 30, 2014 ("Order"), this Court granted Valle's motion for acquittal on Count One, conditionally granted the new-trial motion on Count One, and denied both motions on Count Two. With respect to Count One, the Court granted the judgment of acquittal based on inadequate proof that Valle intended or agreed to commit kidnapping.   This Court held that the verdict could not stand because the government failed to "offer sufficient evidence to permit a reasonable juror to distinguish between Valle's alleged 'real' chats with Van Hise, Aly Khan, and Moody Blues and his conceded fantasy chats with others."   *Id.* at 63.

The Court thoroughly discussed the agreements that the government alleged: (1) Valle's agreement with Van Hise to kidnap Alisa Friscia, (2) Valle's agreements with Aly Khan to kidnap Kathleen Mangan and Andria Noble, and (3) Valle's agreements with Moody Blues to kidnap Kathleen Mangan, Kimberly Sauer, Kristen Ponticelli, and Andria Noble.   (Order at 66–92).   The Court concluded that "as to each co-conspirator and as to each alleged kidnapping target, there is insufficient evidence demonstrating (1) a genuine agreement to commit an actual kidnapping; and (2) specific intent on Valle's part to commit such a crime."   *Id*. at 66. Allowing the verdict to stand, the Court concluded, would "constitute a 'manifest injustice,' because . . . there is 'a real concern' that Valle is innocent of the crime of conspiracy to commit kidnapping."   *Id*. (quoting *United States* v. *Ferguson*, 246 F.3d 129, 136 (2d Cir. 2001)).

### III. Government's Appeal

After the Court granted Valle's Rule 29 motion with respect to the conspiracy charge, the Government appealed.    Valle cross-appealed, arguing that this Court erred in upholding the jury's conviction on the computer charge.    The Court of Appeals affirmed this Court's judgment of acquittal on Count One, and reversed this Court's judgment of conviction on Count Two. *United States* v. *Valle*, 807 F.3d 508 (2d Cir. 2015).    With respect to Count One, the Court of Appeals agreed with this Court's analysis which concluded that "notwithstanding the jury's verdict to the contrary, the prosecutors failed to prove beyond a reasonable doubt that Valle and his alleged coconspirators had entered into a conspiracy to kidnap or that Valle has formed the requite specific intent to kidnap."    *Id*. at 513 (citing this Court's Order). The Appeals Court held that, "we agree with Judge Gardephe that a rational jury could not conclude that this evidence was sufficient to meet the 'beyond any reasonable doubt' requirement."    *Id*. at 522.    With respect to Count Two, citing the rule of lenity, the Appeals Court found that the computer statute under which Valle was convicted, cannot be read to prohibit his conduct.    *Id.* at 527-28.

### DISCUSSION

### I. Applicable Law

To recover damages for wrongful imprisonment under 28 U.S.C. § 1495, Valle must obtain a "certificate of innocence" from the District Court in which he was convicted.    28 U.S.C. § 2513(b). As relevant here, to obtain such a certificate Valle must prove that (1) "his conviction has been reversed or set aside on the ground that he is not guilty of the offense of which he was convicted . . . and," (2) " . . . his acts, deeds, or omissions in connection with such

6

constituted no offense against the United States . . . and he did not by misconduct or neglect cause of bring about his own prosecution." 28 U.S.C. § 2513(a).

This statute in intended to "compensate[] only the truly innocent, making it necessary to separate from the group of persons whose convictions have been reversed, those few who are in fact innocent of any offense whatever." *United States* v. *Racing Services, Inc.*, 580 F.3d 710, 712 (8th Cir. 2009)(citing *Betts* v. *United States*, 10 F.3d 1278, 1284 (7th Cir. 1993). A "reversal of the criminal conviction based on the insufficiency of the prosecution's evidence does not entitle the defendant to a certificate of innocence." *Id*. (citing *Osborn* v. *United States*, 322 F.2d 835, 840 (5th Cir. 1963)); *see also*, *Pulungan* v. *United States*, 722 F.3d 983, 985 (7th Cir. 2013) ("[a] conclusion that the prosecutor did not prove a charge beyond a reasonable doubt differs from a conclusion that the defendant is in fact innocent."); *United States* v. *Graham*, 608 F.3d 164, 170 (4th Cir. 2010) (the statute "orders compensation to the truly innocent who have been prosecuted through no fault of their own." (internal citations omitted)).

As the Seventh Circuit Court of Appeals noted recently:

> Many people believe that persons who spend time in jail without a valid conviction should be compensated. That is not, however, what § 1495 and § 2513 do. They compensate persons who are actually innocent – whether because they did not do what the indictment charged to because what they did is not a crime. *Rigsbee* v. *United States*, 204 F.2d 70 (D.C. Cir. 1953), hold that for the purpose of § 2513, acquittal differs from innocence, and every later court that has considered the subject has agreed. We are among them.

*Pulungan*, 722 F.3d at 985 (citing *Betts*, 10 F.3d at 1283).

Indeed, Courts have recognized that § 1495 and § 2513 are not "avenue[s] for monetary compensation to all whose criminal convictions are reversed after incarceration." *Graham*, 608 F.3d at 171; (citing *Betts*, 10 F.3d at 1284); *United States* v. *Keegan*, 71 F.Supp. 623, 635

7

(S.D.N.Y.1947)). Rather, "the phrasing of the Act and its legislative history proclaim the care with which its framers guarded against opening wide the door through which the treasury may be assailed by persons erroneously convicted." *Id.* (citing *United States* v. *Brunner*, 200 F.2d 276, 280 (6th Cir.1952); H.R.Rep. No. 75–2299, at 2 (1938), quoted in *Keegan*, 71 F.Supp. at 633 (noting that Congress enacted this statute to provide only "certain innocent persons" the ability "to present a claim for financial indemnity" upon "showing their innocence")).

A defendant seeking a certificate of innocence must show that he did not bring about his own prosecution through "misconduct or neglect." 28 U.S.C. § 2513(a)(2). Valle contends, incorrectly, that the "misconduct or neglect means something *other* than the acts, deeds, or omissions the Government wrongly believed were criminal." (Valle Brief at 10) (emphasis in original). But as the Fourth Circuit noted in *Graham*, 608 F.3d at 174, "[t]he plain language of the statute forecloses this theory. . . The statute does not in any way limit the type of causative 'misconduct or neglect' that will bar relief." *Id.*   To make that argument Valle must "insert a modifier—'other,' 'additional,' 'subsequent,' or 'separate' –before 'misconduct' in the second clause of § 2513(a)(2)." *Id.*   Rather, "the plain language of the statute dictates that *any* 'misconduct or neglect' that 'cause[s] or bring[s] about' a petitioner's prosecution renders him ineligible for a certificate of innocence." *Id.* (emphasis added). Indeed, "because only acts of 'misconduct or neglect' that 'cause or bring about' a petitioner's 'own prosecution' disqualify him from relief, it seems likely that those acts often will have originally been charged as crimes." *Id.* at 176-77.

The statute expressly directs that a defendant seeking the certificate "bear the burden of not only alleging but also proving [his] entitlement to the certificate." *Graham*, 608 F.3d at 172

8

(citing 28 U.S.C. § 2513(a); *Betts*, 10 F.3d at 1286; *Rigsbee*, 204 F.2d at 72; *Keegan*, 71 F.Supp. at 635–36). Moreover, because it constitutes a waiver of sovereign immunity, the unjust conviction statute has always been strictly construed. *Osborn* v. *United States*, 322 F.2d 835, 838 (5th Cir.1963); *Keegan*, 71 F.Supp. at 636 ("[A] statute creating a claim against the Government should be strictly construed, and may not by implication be extended to cases not plainly within its terms." (internal quotation marks omitted)). Thus, § 2513 imposes a rigorous burden on those who seek a certificate of innocence.

### Valle Has Not Been Found "Innocent" of the Kidnapping Charges

No Court has found Valle innocent of the kidnapping conspiracy charges. In this Court's Order and Opinion entering a judgment of acquittal of Count One, the Court found, repeatedly, that its decision was based on the Government's failure to present sufficient proof, and not actual innocence.[3]  For example, in the Court's discussion of the electronic communications between Valle and his coconspirators (Order at 52-63), the Court concluded that "[b]ecause the *Government did not offer sufficient evidence* to permit a reasonable juror to distinguish between Valle's alleged 'real' chats with Van Hise, Aly Khan and Moody Blues and his conceded fantasy chats with others, the jury's verdict on Count One cannot stand." (Order at 63)(emphasis added).

The Court went on to find that "[t]he *Government likewise did not offer sufficient evidence* that Valle and his conspirators agreed to commit an actual kidnapping, or that Valle specifically intended that a kidnapping be committed."    (Order at 63) (emphasis added). In analyzing the Government's evidence relating to Valle's communications with each of his coconspirators, the Court concluded:

---

3 Though the Court notes that there is a "real concern" that Valle is innocent of the kidnapping conspiracy, nowhere does the Court find that Valle is, in fact, *actually* innocent of the charged crime.

- Given the *absence of evidence* demonstrating (1) a genuine agreement between Valle and Van Hise to kidnap Friscia, and (2) that either men had specific intent to actually kidnap her, neither Valle's presence on Friscia's block on March 1, 2012, not his false exculpatory statement provides a sufficient basis on which to sustain a conspiracy conviction. (Order at 72) (emphasis added).

- Because the *Government did not offer sufficient evidence* to demonstrate that Valle and Van Hise entered into a genuine agreement to kidnap Friscia, or that either one had specific intent to kidnap her, the Valle/Van Hise chats cannot serve as the basis for a conviction on Count One (Order at 73) (emphasis added).

- *Nothing in the trial record* provides a basis for a reasonable juror to conclude that Valle and Aly Kahn ever entered into a genuine agreement to kidnap Mangan, or that Valle ever had the specific intent to commit this crime. (Order at 75) (emphasis added).

- *Nothing in the trial record* provides a basis for a reasonable juror to conclude, beyond a reasonable doubt, that Valle and Aly Kahn entered into a genuine agreement to kidnap Nobel, or that Valle ever had the specific intent to commit this crime. Valle's chats with Aly Kahn are not sufficient to support a conviction on Count One. (Order at 81) (emphasis added).

- *Given this record*, no reasonable juror could find that Valle and Moody Blues entered into a genuine agreement to kidnap Ponticelli, or that Valle ever had the specific intent to commit this crime. (Order at 90) (emphasis added).

- But the question before this Court is whether the Government proved beyond a reasonable doubt that (1) Valle entered into genuine agreements with Van Hise, Aly Khan, and Moody Blues to kidnap Mangan, Friscia, Sauer, Noble or Ponticelli; and (2) Valle had the specific intent to kidnap one or more of these women. An exhaustive analysis . . . demonstrate[s] that *the Government has not met its burden*. (Order at 91) (emphasis added).

Similarly, the decision of the Court of Appeals affirming this Court's judgment of acquittal was grounded in what that Appellate Court found to be the Government's "fail[ure] to prove beyond a reasonable doubt that Valle and his alleged coconspirators [ ] entered into a conspiracy to kidnap or that Valle had formed the requisite intent to kidnap."    *Valle*, 807 F.3d at 509 (citing

10

this Court's Order). The Court held that "[o]n this record" the conviction could not stand. *Id*. at 523.

Because there has been no finding, either by this Court or the Court of Appeals that Valle is actually innocent of the kidnapping conspiracy, Valle is not entitled to a certificate of innocence pursuant to 28 U.S.C. §2513.

## II.  Valle's Misconduct Brought About His Own Prosecution on Counts One and Two

Between 2006 and 2012, Valle served as an officer with the New York City Police Department. (Tr. 156).    As a member of the police department, Valle received extensive training in the use of force, was entrusted with access to weapons, and could access law enforcement databases containing restricted and confidential information about citizens. (Tr. 914-47, 992-94, 975-86, GX 610-14).    While serving as an NYPD officer, Valle discussed – in gruesome detail – the logistics of kidnapping and using violence, including rape, torture and murder, against at least five real women with whom Valle had personal connections.    In addition to the communications, Valle gathered information about where his targets lived and worked. (Tr. 273, 346-50, 560-84).    In an effort to learn their home addresses and establish a relationship of trust, Valle offered to mail two of the targets Policeman's Benevolent Association cards. (Tr. 244, 273, 907-10; GX 110, 439). Valle used an online search engine to obtain Ponticelli's address by googling her name and the word address. (Tr. 1276; GX 1005A). Valle sent text messages to his targets asking for information about their planned moves and for updated employment information. (Tr. 273, 281, 346-49; GX 436, 439).

Valle also arranged to meet, or at least observe, two of his targets, not including his wife whose whereabouts Valle already knew, and he scheduled meetings with the targets near their

11

workplaces and homes. (Tr. 289-91, 352-53, 997-98). On one occasion, Valle told Moody Blues

that he planned to meet Sauer for lunch in Maryland. (GX 410). Valle then drove to Maryland

and met with Sauer for lunch with his family. (Tr. 290-91). Afterward, Valle described the

meeting to Moody Blues and his thoughts of violence as the lunch meeting unfolded. (GX 410).

On a separate occasion, Valle conducted physical surveillance of Friscia's home in Manhattan,

which he reported to Van Hise. (Tr. 1034; GX 434).

On multiple occasions, Valle researched methods for manufacturing chloroform at home

(Tr. 1239; GX 1000), and he shared a chloroform recipe with his co-conspirators. (Tr. 542; GX

604).   He conducted research on incapacitating victims with chloroform, the use of ropes to

restrain victims, the type of rope that was "best" for restraining people, and methods of

assaulting a person with a blunt object. (Tr. 1239, 1275; GX 1000, 1001). Valle also studied

other kidnappings and examining how the kidnappers in those cases were caught. He reviewed a

number of articles containing details about abducted women, convicted kidnappers, the

investigations of those crimes, and the resulting convictions. (Tr. 1197; GX 217, 229, 230, 606).

Valle accessed NYPD computer systems to gather information on women he was

discussing with his online associates, including Nobel, Sauer, and a woman named Maureen

Hartigan. (Tr. 571-84; GX 615, 616B, 616C, 616E, 617). In an effort to learn more about them,

Valle entered these women's names into police databases that contained confidential and

restricted personal information, including their dates of birth, social security numbers, driver's

license information, and home addresses. (Tr. 570-72, 578-84, 940-43; GX 615, 616B, 616C,

616E, 617). Valle searched for Nobel and Sauer on July 21, 2011, and Hartigan on May 31,

2012. (Tr. 578-84; GX 616B, 616C, 616E).

Valle had been trained that these databases could be accessed only "in the course of a [police officer's] official duties and responsibilities" and that "[t]here were no exceptions to this policy." (Tr. 931, 934, 940-41; GX 612). Valle was further instructed that accessing the databases for "non-work" purposes was a violation of NYPD policy, state and federal law, and that the penalties for doing so included "arrest, prosecution, termination of employment and fines up to $10,000." (Tr. 940-42, 950). There was no serious dispute that Valle lacked a legitimate law enforcement purpose for using the database to research Nobel, Sauer, and Hartigan.

Finally, in a post-arrest statement to law enforcement agents Valle admitted to having been on Alisa Friscia's block on March 1, 2013, which was within days of his detailed conversation with Van Hise about abducting Friscia.   In that statement Valle also acknowledged that his conversations with Van Hise, Aly Khan and Moody Blues were serious and genuine in a way that his conversations with others were not, and that his chats with Moody Blues and Aly Khan began to "bleed" into his personal life. (Tr. 1031)

In light of the nature of Valle's online conduct, the risk he posed to the public as an NYPD officer with access to firearms and other weapons, and with the authority conferred upon law enforcement officers, Valle's abuse of his position in accessing confidential law enforcement databases, and Valle's post-arrest statement, Valle's own misconduct brought about his own prosecution.   As such, this Court should deny his request for a certificate of innocence.

13

**CONCLUSION**

For the reasons described above, the Court should deny Valle's motion for a certificate of

innocence.

New York, New York
August 8, 2016

Respectfully submitted,

/s/ Hadassa Waxman
Hadassa Waxman
Assistant United States Attorney
212-637-2277

14